IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 1:11-CR-110 |
| Plaintiff, | : | Chief Judge Susan J. Dlott |
| vs. | : | ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS |
| ALONZO M. EDWARDS, | : | |
| Defendant. | : | |

This matter comes before the Court on Defendant Alonzo Edwards' Motion to Suppress Evidence (Doc. 13). The Court held a hearing on the motion on November 15, 2011. Defendant then filed a post-hearing supplemental memorandum in support of his motion to suppress (Doc. 20), the Government filed a supplemental response (Doc. 21), and Defendant filed a reply in support (Doc. 22).

Edwards is charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). Edwards moves to suppress the firearm discovered and the statements he made on the evening of May 30, 2011 on grounds that they were obtained in violation of his Fourth Amendment rights. Specifically, Edwards contends that the officers did not have reasonable suspicion to conduct a stop and frisk. Alternatively, he contends that the actions of the officers rose to the level of an arrest which was not supported by the more stringent probable cause standard. For the reasons that follow, Defendant's motion is **GRANTED**.

## I. FACTUAL BACKGROUND

Cincinnati Police Officer Dion Mack testified at the suppression hearing. The following factual account regarding the arrest is drawn from Officer Mack's testimony unless otherwise noted.

Shortly after 9:00 p.m. on Memorial Day, May 30, 2011, a 911 operator received a call from an individual who reported that someone was walking around with a gun on Lynn Street. (DX 3, CD recording of 911 call.) The caller told the operator that the man shot the gun on the corner of Dayton and Lynn streets. The caller described the shooter as a black guy wearing a black t-shirt, black shorts, and sunglasses and said he was "young," maybe 30. The caller declined to give the operator her name or telephone number. Before ending the call, the operator asked the caller if she knew what the man was shooting at, and the caller responded that the man was just firing the gun up in the air.

Based on this information, police dispatch put out a call for officers to respond to Dayton and Lynn for a "gun run." (DX 3, CD recording of dispatch.) The dispatcher said, "Anonymous caller states male in his 30s fired several shots up in the air." Cincinnati Police Officers Ernst and Mack were working an off-duty detail in the area. Both officers were in uniform and on patrol in a marked police cruiser. Because they were only five blocks from the intersection of Dayton and Lynn streets when the call came in, Officers Mack and Ernst decided to respond.

The officers approached the intersection of Dayton and Lynn while driving northbound on Lynn Street. Officer Mack requested a description of the shooter, and the dispatcher described the individual as a male black in his 30s wearing sunglasses, a black shirt, and black shorts. (*Id.*)

2

As the police cruiser turned left to go westbound on Dayton Street, the officers observed a black male wearing a black shirt and black pants with sunglasses up on his head, later identified as Defendant Alonzo Edwards. Edwards and another black male wearing a red outfit were walking eastbound on Dayton toward Lynn Street (and toward the officers). As the police cruiser turned westbound onto Dayton, Edwards stopped, turned around, and began walking back eastbound on Dayton in the direction from which he had he had come. Officer Mack testified that when Edwards turned around, he "quickened his step" going westbound on Dayton, away from the officers.

Officer Ernst stopped the police car on Dayton Street ten to fifteen yards away from Edwards. Officer Mack got out of the car even before it stopped, pointed his firearm at Edwards, and ordered him to stop. Officer Mack continued to point his gun at Edwards and shouted at him to stop at least ten times, but Edwards continued walking away from the officer. Officer Mack hurried to get right behind Edwards. Finally, Edwards stopped, turned to face the officer, and said, "What?" Officer Mack told Edwards to turn away from him and put his hands on his head. Edwards initially hesitated but then complied. At this point, Officer Ernst also was out of the police cruiser and had her gun pointed at Edwards. Officer Mack handcuffed and immediately frisked Edwards. He lifted Edwards' shirt and observed a holstered gun, which he took from Edwards. Edwards told Officer Mack, "That gun ain't hurt nobody. No bodies on that gun. You can check."

At the suppression hearing, Officer Mack testified that it is not uncommon to see a black male in the neighborhood where he stopped Edwards. Officer Mack also testified that although the dispatcher did not indicate on which part of the street to look for the shooter, he knew from

experience to look on the west side of Dayton Street. Officer Mack further admitted that although the dispatcher described the shooter as wearing black shorts, he concluded that Edwards was the subject of the anonymous call, even though he was wearing black pants, because Edwards otherwise fit the caller's description.[1]

Officer Mack, who has been a Cincinnati Police Officer for ten years, has patrolled the area including Dayton and Lynn streets for the majority of his career. He knows the area to be a dangerous, high drug trafficking area. Officer Mack testified that he immediately pointed his firearm at Edwards when he exited the police car because when he heard from the dispatcher that shots had been fired, he considered it an "active shooting" situation and believed he might have to engage an individual with his firearm.

## II. ANALYSIS

Edwards moves the Court to suppress the evidence and statements obtained on the evening in question on grounds that the stop and frisk was without reasonable suspicion and his arrest was conducted without probable cause – particularly in light of the fact that the information available to the officers was provided by an anonymous 911 caller. The Government contends that the stop, search, and arrest were constitutional and that the evidence should not be suppressed.

The Court must first determine whether the officer's decision to stop and frisk Edwards was justified under the framework set forth in *Terry v. Ohio*, 392 U.S. 1 (1969). The Sixth Circuit recently explained the *Terry* stop analysis as follows:

---

[1] Officer Mack's arrest report of the incident indicates that Edwards was wearing black pants at the time of the arrest. (DX 1.) In addition, the black pants Edwards was wearing that evening were introduced into evidence at the hearing. (DX. 8.)

4

> Officers may conduct a "reasonable search for weapons for the protection of the police officer" when they have reason to believe that they are "dealing with an armed and dangerous individual." *Terry*, 392 U.S. at 27, 88 S. Ct. 1868. . . . "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S. Ct. 673, 145 L. Ed.2d 570 (2000) (citing *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 104 L. Ed.2d 1 (1989)). The officers must be able to articulate more than an inchoate and unparticularized suspicion or hunch. *Id.* at 123–24, 120 S. Ct. 673 (citing *Terry*, 392 U.S. at 27, 88 S. Ct. 1868). This determination is made in light of the totality of the circumstances. *United States v. Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744, 151 L. Ed.2d 740 (2002).

*United States v. Mays*, 643 F.3d 537, 541 (6th Cir. 2011). The threshold issue, then, is whether the officers' suspicion that Edwards was engaged in criminal activity was reasonable in light of the totality of the circumstances.

At the moment that the officers drew their weapons on Edwards and he stopped walking,[2] the totality of the circumstances were as follows: (1) the dispatcher had announced that an anonymous caller reported that a black male in his 30s and wearing a black shirt, black shorts, and sunglasses had fired a gun into the air in the location of Dayton and Lynn streets; (2) when the officers got to that location, they saw a black man with a black shirt, black pants, and

---

[2] A person is seized for the purposes of a *Terry* analysis when an officer "by means of physical force or show of authority, has in some way restrained [his] liberty," *Terry*, 392 U.S. at 19 n.16, such that "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988). Stopping after being ordered to stop triggers the Fourth Amendment. *United States v. Johnson*, 620 F.3d 685, 691 (6th Cir. 2010). "Because reasonable suspicion for a stop cannot be based on events that occur after the defendant is seized," this Court cannot consider for *Terry* purposes any facts that arose after the officers pulled their weapons on Edwards and he stopped. *Johnson*, 620 F.3d at 696.

5

sunglasses on Dayton Street walking toward Lynn Street; (3) the man turned and walked away from the officers with a "quickened" step when the officers pulled onto Dayton Street; and (4) Officer Mack ordered the man to stop at least ten times before he stopped.

A significant obstacle to a finding that the totality of the circumstances gave Officer Mack reason to believe that he was dealing with an armed and dangerous individual when he stopped Edwards is the fact that anonymous tips are generally lacking in reliability. *Florida v. J.L.*, 529 U.S. 266, 274 (2000) ("an anonymous tip lacking indicia of reliability . . . does not justify a stop and frisk whenever and however it alleges the illegal possession of a firearm.") In *J.L.*, an anonymous caller reported to the police that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun. Officers went to the bus stop and saw three black males, one of whom, J. L., was wearing a plaid shirt. Apart from the tip, the officers had no reason to suspect any of the three of illegal conduct. The officers did not see a firearm or observe any unusual movements. Thus, the officers' suspicion that J.L. was carrying a weapon arose not from their own observations but solely from a call made from an unknown location by an unknown caller. The Supreme Court held that the anonymous tip, without more, was insufficient to justify the stop and frisk. The Court observed that while an accurate description of a subject's location and appearance is reliable in the limited sense that it will help police correctly identify the person the tipster means to accuse, reasonable suspicion "requires that a tip be reliable *in its assertion of illegality*, not just in its tendency to identify a determinate person." *Id.* at 272 (emphasis added).

After the Supreme Court issued the *J.L.* decision, the Sixth Circuit applied its reasoning to hold that an anonymous call to a drug hotline complaining of drug sales at a specific street

6

corner, combined with the officers' observation of a group of individuals walking away from that street corner, did not support reasonable suspicion. *United States v. Patterson*, 340 F.3d 368, 370 (6th Cir. 2003). In *Patterson*, the officers responded to the scene over five-and-a-half hours after the anonymous tip was made, and the tip did not specifically identify any individual. Noting that the tip lacked any degree of specificity as to the individuals involved and the time gap between the tip and the officer's arrival, the Sixth Circuit held that the hotline tip was "of little value." *Id.* at 371. Further, the court found that the defendant walking away from the police when they got out of their unmarked car was a factor to be "outrightly dismissed." *Id.* at 372. "Walking in the opposite direction from the police could be considered an indication of a person's fear of being caught participating in illegal activities, but it also could be purely innocent activity." *Patterson*, 340 F.3d at 371.

Likewise, the Sixth Circuit concluded that a 911 hangup call placed from a cul-de-sac of five or six houses did not provide reasonable suspicion for officers to make an investigatory stop of a car turning from that street. *United States v. Cohen*, 481 F.3d 896, 899 (6th Cir. 2007). Analogizing the 911 hangup call to an anonymous tip, the Sixth Circuit specified that while "[s]uch a tip is not irrelevant in evaluating the totality of the circumstances, . . . [it] should be given little weight." *Id.* at 900. The greatest shortcoming of the "tip" comprised of the 911 hangup call was that it could have suggested multiple possibilities — an erroneously activated speed dial, a prank, a mistakenly dialed number — that did not connote an assertion of illegality. *Id.* (citing, *inter alia*, *United States v. Davis*, 235 F.3d 584, 587-88 (D.C. Cir. 2000) (stating that a 911 tip that a man dressed in all black was running away from a particular address made no assertion of criminal activity and fell "far short of what *Terry* requires," but concluding that the

7

911 tip combined with eyewitness accounts of a shooting at that address supplied reasonable suspicion), *cert. denied*, 534 U.S. 860 (2001)). Further, the 911 hangup call had even less information than an anonymous tip because the called did not provide a description of any determinate person. *Id.*

The Sixth Circuit again concluded that officers lacked reasonable suspicion to stop an individual on the basis of the 911 call from a caller who reported "some people" connected with a blue Cadillac that were "walking around" outside the caller's apartment. *United States v. Johnson*, 620 F.3d 685, 687 (6th Cir. 2010). The totality of the circumstances known to the officers when they drew their weapons on the defendant were: (1) the defendant was in a high-crime area, (2) it was 4:00 a.m., (3) the officers were responding to a 911 call, (4) two or three minutes after the 911 call, the officers observed the defendant twenty to thirty yards from the blue Cadillac referenced in the call, (5) the officers did not notice anyone else in the area, (6) the defendant did not stop when called to by the officers but continued walking, and (7) he was carrying a bag. *Id.* at 692. The Sixth Circuit found that the first two factors "may not, without more, give rise to reasonable suspicion" but could be considered in the totality of the circumstances. *Id.* (citing *United States v. Caruthers*, 458 F.3d 459, 467 (6th Cir. 2006)). The strength of the third through fifth factors turned on the content and reliability of the call, which the court found deserved "little weight" because the caller did not give descriptive information about the suspects and did not specify that she had observed any criminal behavior. *Id.* at 693. Finally, the court discounted the sixth and seventh facts, concluding that there was nothing suspicious about the defendant's walk away from the officers or the fact that he carried a bag. *Id.* at 695. "In sum," said the court in concluding that the officers lacked reasonable suspicion to

8

make the stop, "the totality of the relevant circumstances consisted of contextual factors that would have applied to anyone in the neighborhood." *Id.* at 696.

Conversely, the Sixth Circuit has held that, in combination with an anonymous tip, an officer's observation of a suspect fleeing and engaging in furtive movements can justify a *Terry* stop. *United States v. Caruthers*, 458 F.3d 459, 465 (6th Cir. 2006). In *Caruthers*, police received an anonymous call that a black male wearing a red shirt and shorts had fired a gun in the air at a specific location. When an officer arrived at the location, he saw a black man wearing a red shirt, and no one else was in the area. The officer spoke to the man from his cruiser, and the man then "took off in a hurried fashion." *Id.* at 462. The officer gave chase and then observed the man leaning over toward the ground. The officer then grabbed the man and put him in the back of the patrol car. The Sixth Circuit concluded that these circumstances, namely that at the time of the stop the officer knew that the defendant "whose general appearance and location matched the description given in the anonymous shot-fired call — fled and made furtive movements when approached by the police late at night in a high-crime area," amounted to reasonable suspicion. However, the court noted that it gave the anonymous call "little weight in the reasonable-suspicion calculus" and that "the stop of Caruthers would have been impermissible if it had been justified solely by the anonymous call." *Id.* at 466 and 465 (citing cases). In other words, the fact that the defendant fled from the officer was of key importance to the Sixth Circuit's conclusion that the officer had reasonable suspicion to make a *Terry* stop.

In a similar case decided outside the Sixth Circuit, an appellate court held that the following objective facts supported a finding of reasonable suspicion: (1) a 911 call reporting someone had fired a gun at a specific residence, (2) when the officer arrived on the scene three

9

minutes later, a woman waved down the officer and told her that a black male wearing a gold shirt had shot at her and her son, (3) only one car was in the driveway of the residence and it had its brake lights on, and (4) it was a high-crime area. *United States v. Fisher*, 597 F.3d 1156, 1159 (10th Cir. 2010). In upholding the *Terry* stop, the Tenth Circuit emphasized the fact that there was only one vehicle at the scene and it appeared ready to depart. *Id.* (citing *United States v. Brown*, 334 F.3d 1161 (D.C. Cir. 2003) (upholding a *Terry* stop by police officers responding to a report of gun fire in a nearly deserted parking lot).

The Government in this case acknowledges that anonymous tips reporting general criminality are, without more, unreliable. However, it notes that numerous circuit courts of appeal have held that anonymous 911 calls reporting "an ongoing emergency" are entitled to a higher degree of reliability. In *J.L.*, which concerned an anonymous tip that a person was "carrying a gun," the Supreme Court noted that "[t]he facts of this case do not require us to speculate about the circumstances under which the danger alleged in an anonymous tip might be so great as to justify a search even without a showing of reliability." 529 U.S. at 273. Following that decision, several courts "'distinguished *J.L.* when the tip is not one of general criminality, but of an ongoing emergency.'" *United States v. Simmons*, 560 F.3d 98, 104 (2d Cir. 2009) (quoting *United States v. Hicks*, 531 F.3d 555, 558-59 (7th Cir. 2008)); *see also United States v. Brown*, 496 F.3d 1070, 1071, 1077 (10th Cir. 2007) (911 call reporting a man who entered an apartment brandishing a gun and threatening the tenant); *United States v. Elston*, 479 F.3d 314, 315, 319 (4th Cir. 2007) (911 call reporting a drunk driver who had recently left the caller's home and threatened to use a firearm in his possession in the future); *United States v. Terry-Crespo*, 356 F.3d 1170, 1172, 1176 (9th Cir. 2004) (911 caller had been threatened by the

10

suspect with a firearm). The Second Circuit ultimately agreed with these Circuit Courts and held that "an anonymous 911 call reporting an ongoing emergency is entitled to a higher degree of reliability and requires a lesser showing of corroboration than a tip that alleges general criminality." *Id.* at 105.

At the time the parties filed their briefs on this matter, the Sixth Circuit had not considered whether an anonymous call reporting an ongoing emergency was entitled to a greater degree of reliability than an anonymous call reporting general criminality. However, on December 19, 2011, the Sixth Circuit issued a decision in which it agreed with the reasoning of *Simmons*. *Robinson v. Howes*, No. 10-2696, 2011 WL 6317505, at *10 (6th Cir. Dec. 19, 2011).

In *Robinson*, the Sixth Circuit was asked to consider whether a 911 call and the defendant's evasive conduct gave rise to reasonable suspicion. The court discussed *J.L.* and noted that "[w]here an informant tip, rather than police observation, is the basis of an investigatory stop, the tip must exhibit 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.'" *Id.* at *8 (quoting *J.L.*, 529 U.S. at 270). However, the court went on to distinguish the case from *J.L.* for four reasons. First, the call was not completely anonymous. The 911 caller had not given his name, but he did give the address of the house from which he was calling.[3] The court noted that "the address is an indicium of reliability that adds to the totality of the circumstances and distinguishes the call from the completely unidentifiable tipster in *J.L.*" *Id.* at *9. Second, the 911 call was a contemporaneous eyewitness account, and "[f]irsthand knowledge and contemporaneity weigh in favor of a statement's

---

[3] The caller had reported that the shooting had just occurred, that the shooter was across the street in a yellow car, and that the caller had just observed the man fire his weapon into a house. *Id.* at *6-7.

11

reliability." *Id.* Third, unlike *J.L.*, the call did not simply report a man carrying a gun but described shots being fired. *Id.* at *10. Quoting the Second Circuit's decision in *Simmons*, the court concluded that "the emergency nature of the call in this case adds to the totality of the circumstances comprising reasonable suspicion." *Id.* Finally, the defendant had acted evasively upon seeing the police approach, jumping out of the car while yelling, "I've done nothing wrong" and walking away from the car after being told to stay put. *Id.* Based on the totality of the circumstances, the Sixth Circuit found that the officers were entitled to reasonably suspect the defendant of a shooting and that their investigatory stop was therefore justified. *Id.*

The facts of the instant case fall into a gray area based on the above precedent: the anonymous caller specifically described Edwards by his race and clothing; and the call plainly described the criminal act of firing a weapon in a neighborhood. However, missing from the "totality of the circumstances" in this case are two factors typically present in cases in which courts have found stop-and-frisks valid under *Terry*: (1) Edwards did not flee, and (2) he did not stick his hands in his pockets or make other furtive movements. *See, e.g., Caruthers*, 458 F.3d at 462-63 (defendant panicked, fled from police, and made a furtive movement to plant his gun beside a wall); *United States v. Bohannon*, 225 F.3d 615, 616 (6th Cir. 2000) (defendant placed hand in pocket and acted "very nervous"); *United States v. Lane*, 909 F.2d 895, 896-97 (6th Cir. 1990) (defendant fled from police officers and repeatedly attempted to reach into his pockets when being searched); *see also United States v. Brown*, 310 F. App'x 776, 781 (6th Cir. 2009) (holding that an officer had a reasonable belief that her safety was in jeopardy when defendant "was acting nervously and evasively, and . . . made a furtive gesture towards his back pocket as he tried to leave the scene.")

12

Simply walking away from the police does not give rise to reasonable suspicion. *Caruthers*, 458 F.3d at 466 (citing *Florida v. Royer*, 460 U.S. 491, 498, 103 S. Ct. 1319 (1983)); *Patterson*, 340 F.3d at 371 ("[w]alking in the opposite direction from the police could be considered an indication of a person's fear of being caught participating in illegal activities, but it also could be purely innocent activity."). Further, encountering an individual at night in a high-crime area may not, without more, give rise to reasonable suspicion. *Caruthers*, 458 F.3d at 467 (citing *Bennet v. City of Eastpointe*, 410 F.3d 810, 830 (6th Cir. 2005)). Finally, the fact that Edwards did not immediately stop when ordered to do so does not materially contribute to a finding of reasonable suspicion. As the Sixth Circuit held in *United States v. Campbell*, 486 F.3d 949 (6th Cir. 2007), where an officer has no cause to stop a suspect, the suspect "'need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds.'" *Id.* at 954 (quoting *Florida v. Royer*, 460 U.S. 491, 497 (1983)).

With regard to the anonymous 911 call, this Court finds it is similar to the call made in *J.L.* and thus the case must be governed by that precedent. The Supreme Court's central concern in *J.L.* was that a "person seeking to harass another" could make a "false report" merely by placing an anonymous phone call. *J.L.*, 529 U.S. at 272. As in *J.L.*, the call in this case lacked sufficient indicia of reliability to provide reasonable suspicion for the officer to make the arrest. Unlike in *Robinson*, the caller did not provide any identifying information that would serve as an indicium of reliability. Neither is there any other evidence in this case to support the caller's claim that a gun had been discharged. Dayton Street is a residential area, and there was no

13

evidence that any other person reported hearing a gun shot. The responding officers were a few blocks away when the call came in, and they did not attest to hearing any gunshots. Furthermore, Edwards was walking *toward* the intersection of Dayton and Lynn streets when the officers saw him. The caller had reported shots fired *at* that intersection just minutes before, so the fact that Edwards was walking toward that very intersection, rather than away from it, fails to constitute a circumstance contributing to a finding of reasonable suspicion.

Neither do the facts of this case fall squarely into the mold set out in *Simmons*, that is, when *J.L.* is distinguishable because the tip concerns an ongoing emergency. The dispatch stated, "Anonymous caller states male in his 30s fired several shots up in the air." There was no indication that shots were being fired at any person or thing, nor was there any indication that the situation was ongoing. Thus, it is far from clear that the Sixth Circuit would find that the circumstances of this case presented an "ongoing emergency" such that the anonymous call would be entitled to a higher degree of reliability.

At bottom, "[t]he basic requirement remains that an investigative stop must be predicated on reasonable suspicion that criminal activity is afoot." *Simmons*, 560 F.3d at 105. The Court concludes that the totality of the circumstances in this case do not support a finding that Officer Mack reasonably suspected Edwards of criminal activity. First, while the anonymous 911 call is relevant in evaluating the totality of the circumstances, it alone lacked sufficient indicia of reliability to provide reasonable suspicion to justify a *Terry* stop under the precedent of *J.L.* Second, Edwards' clothing did not exactly match the description provided by the anonymous caller: he was wearing pants when the shooter had been described as wearing shorts. Third,

Edwards did not flee from the police or make furtive movements; rather, he simply turned and walked away. Finally, Edwards was not required to stop when the officer ordered him to do so.

For the above reasons, the Court finds that the officers did not have reasonable suspicion to stop and frisk Edwards on the evening of May 30, 2011. Having determined that the officers did not have reasonable suspicion to stop Edwards in the present case, the Court need not undertake further inquiry into the validity of Edwards' subsequent arrest.[4] The stop was unlawful from its inception, and all evidence seized and statements subsequently obtained are fruits of the unlawful stop and must be suppressed. *Wong Sun v. United States*, 371 U.S. 471, 485 (1963).

### III. CONCLUSION

For the reasons stated above, Defendant's Motion to Suppress (Doc. 13) is **GRANTED**.

IT IS SO ORDERED.

Chief Judge Susan J. Dlott
United States District Court

---

[4] Nevertheless, the Court would likely find that Edwards was under arrest at the moment Officer Mack handcuffed him and that the officer lacked probable cause to do so. Factors relevant to a determination of whether a defendant is under arrest for Fourth Amendment purposes include "'the transportation of the detainee to another location, significant restraints on the detainee's freedom of movement involving physical confinement or other coercion preventing the detainee from leaving police custody, and the use of weapons or bodily force.'" *United States v. Shaw*, 464 F.3d 615, 621 (6th Cir. 2006) (quoting *United States v. Richardson*, 949 F.2d 851, 857 (6th Cir. 1991)). In this case, two of the three factors are present: Officer Mack handcuffed Edwards immediately after he stopped, and both officers had their guns pointed at him during the encounter. A reasonable person in Edwards' position would have believed himself to be under arrest at the time he was handcuffed.